**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 15-87 |
| | ) | Judge Nora Barry Fischer |
| LANCE GARDENHIRE, | ) | |
| LASEAN GARDENHIRE, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

## I. INTRODUCTION

This matter is before the Court on a dispute involving the Government's requested forfeiture of 405 Zara Street, which is the residence of husband/wife codefendants Lance and Lasean Gardenhire. (Docket Nos. 2667; 2706). The Government seeks complete forfeiture of the residence; while Defendants maintain that the property should be partially forfeited. (*Id.*). The parties submitted briefs and exhibits on August 14, 2017, the Government filed its response on August 17, 2017 and Defendants' response was filed on August 18, 2017. (Docket Nos. 2568; 2569; 2578; 2584). The Court held a hearing on August 21, 2017 at which time it heard witness testimony and accepted documentary evidence; the transcript of such proceedings was filed of record on August 31, 2017. (Docket Nos. 2585; 2617). The parties subsequently filed proposed findings of fact and conclusions of law on October 2, 2017 and October 20, 2017. (Docket Nos. 2667; 2706). After careful consideration of the parties' arguments in light of the credible evidence of record, the Court will enter an in personam forfeiture order against the Gardenhires, forfeiting the entirety of both of their respective rights, title and interests in 405 Zara Street to the Government.

## II. BACKGROUND

### a. Guilty Pleas/Admitted Criminal Conduct/Undisputed Forfeitures

On the day set for jury selection and trial of this matter, April 24, 2017, Lance pled guilty to Count One of the Superseding Indictment at Criminal Number 15-87, i.e., one count of conspiracy to distribute and possess with intent to distribute 1 kilogram or more of heroin, contrary to the provisions of 21 U.S.C. §§ 841(a)(1), and 841(b)(1)(A)(i), and in violation of 21 U.S.C. § 846, from March 2012 through May 21, 2015 and to Count Three of the Superseding Indictment, i.e., one count of conspiracy to commit money laundering, in violation of 18 U.S.C. §§ 1956(h) and (a)(1)(B)(i), also from March 2012 through May 21, 2015. (Docket No. 2272). Lasean likewise pled guilty to the money laundering conspiracy charge at Count Three. (Docket No. 2263). Both had plea agreements with the Government which enabled them to bring the instant challenge to the forfeiture of their interests in 405 Zara Street.

On August 30, 2017, Lance was sentenced to 240 months' incarceration and 10 years' supervised release pursuant to his Rule 11(c)(1)(C) plea agreement with the Government. (Docket No. 2609). He was also ordered to pay a $200 special assessment and to forfeit five vehicles, i.e., a 2008 Infinity QX56; a 2008 Mercedes Benz GL450; a 2005 Mercedes Benz C230; a 2009 Mercedes Benz S550; and a 2007 Nissan Titan. (Docket Nos. 2609; 2652). Lasean was sentenced to 8 months' incarceration, to be followed by three years of supervised release. (Docket Nos. 2611; 2634). She was ordered to pay a $100 special assessment and to forfeit her interest in four vehicles, which were all of the vehicles her husband agreed to forfeit except for the 2009 Mercedes Benz S550. (Docket Nos. 2611; 2634; 2652). It appears that Mrs. Gardenhire has retained the 2009 Mercedes Benz S550. In addition, a subsequent Order was entered authorizing the U.S. Marshal Service to sell the 2008 Mercedes Benz GL450 and to

disburse the gross proceeds from the sale up to $3,503.05 to Team Rahal of Steel City, Inc. (Docket No. 2710).

It is undisputed that Lance Gardenhire was the leader of the Lance Gardenhire Drug Trafficking Organization ("Organization") and served as the main wholesale supplier of heroin which he imported from his New Jersey source of supply to be further distributed by other members of the Organization throughout the Pittsburgh area. (Docket No. 2499 at ¶¶ 9-13). The parties stipulated that Lance was criminally responsible for the distribution of between 30 and 90 kilograms of heroin for guidelines purposes. (*Id.*). The factual basis of the offense conduct set forth in Lance's Presentence Investigation Report, ("PIR") to which no objections were lodged by the parties, makes clear that this was a cash operation:

> 11. **Lance Gardenhire** and Corey Cheatom worked together to secure multi-kilogram shipments of heroin from New Jersey. They received the heroin shipments on a regular basis, sometimes as often as every week or two. They paid drivers to transport hundreds of thousands of dollars of heroin trafficking proceeds to their source of supply in New Jersey, and then the drivers returned to Pittsburgh with multiple kilogram quantities of heroin. On August 2, 2014, one of the Organization's drivers was apprehended on his way back from New Jersey with 2,400 bricks of the Organization's heroin. The quantity of heroin in the bricks exceeded 2 kilograms.
>
> 12. After the heroin arrived in Pittsburgh from out-of-state, **Lance Gardenhire** and Cheatom relied upon the other distributors for the Organization to turn the bricks of heroin into cash. They provided hundreds of bricks of heroin at a time to their distributors on credit and received payment after the heroin was further distributed throughout Western Pennsylvania.

(Docket No. 2499 at ¶¶ 11-12). With respect to his money laundering activities, Lance admitted to conspiring with his wife and "filter[ing] thousands of dollars of [his] heroin trafficking proceeds through Lasean Gardenhire's bank accounts at federally insured banks that were engaged in interstate commerce." (*Id.* at ¶ 13). Lasean similarly admitted to conspiring with her

husband to commit money laundering and that drug proceeds generated by Lance's heroin dealing were funneled through her various bank accounts, with such funds being used to pay their various expenses. (Docket No. 2501 at ¶¶ 6-9).

### b. *Summary of Evidence Presented at Hearing*

At the August 21, 2017 hearing, the Government presented the testimony of codefendant Juan Wysong and Special Agent Sean Currie of the Drug Enforcement Administration, both of whom the Court found to be credible witnesses. (Docket Nos. 2585; 2617). To this end, Wysong generally detailed his heroin trafficking activities with Lance and other members of the Organization from 2012-2015. (Docket No. 2617 at 12-77). Special Agent Currie, who reported having 18 years of law enforcement experience, and was one of the case agents for this prosecution, explained his investigation of the Gardenhires' finances and other activities. (*Id.* at 79-155). The Government also admitted a number of exhibits supporting its position in this matter. (Govt. Exs. G2; J8; J36-J42; G43-G44; J45-J50; G51; J52; Govt. Demos 1-3). In opposition, the Defendants called Lasean's mother, Leslie Nunley; Lance's father, R. Gardenhire Bey; and a friend, Charles Edward Whitehead Timbers, III and also admitted a few photographs as exhibits. (Docket No. 2617 at 156-214; Def. Exs. 1-2). The Court found these witnesses to be generally credible to the extent that they explained the renovations conducted at 405 Zara Street; however, it does not credit certain of Nunley's testimony concerning the source of funds which were allegedly gifted to the Gardenhires as such testimony was not credibly supported by the other evidence of record and for other reasons more fully described herein. *See e.g., United States v. Smith*, 751 F.3d 107, 116-17 (3d Cir. 2014) (reliable hearsay statements from a credible third party declarant may be relied upon by court at sentencing). Finally, the Government now moves to admit Nunley's bank records as exhibits in this proceeding. (*See Nunley Bank*

*Statements July-December 2012*; Docket Nos. 2617 at 182-83; 2667; 2706). No opposition to same having been lodged by Defendants, the Court will admit these records into these proceedings, and consider them.

        c.   *The Gardenhires' Income and Expenditures During 2011-2012*

Lance and Lasean have been in a romantic relationship since 1998 and were married on July 14, 2012. (Docket Nos. 2499; 2501). At the time of their marriage, the couple had two children; they subsequently had two additional children for a total of four children.[1] (Docket No. 2706). In 2010, Lance and Lasean were indicted together in this district at Criminal Number 10-47. *See United States v. Lance Gardenhire and Lasean Nunley*, Crim. No. 10-47 (W.D. Pa. Mar. 23, 2010). That case was dismissed after the Hon. David S. Cercone issued an Opinion suppressing evidence. (Crim. No. 10-47 at Docket Nos. 90; 95).

Starting in September of 2011, Lasean worked as a customer service representative for Duquesne Light. (Docket No. 2617 at 92). She was terminated from this position after she pled guilty to conspiracy to commit money laundering in April of 2017 in this case. (*Id.*). Special Agent Currie's financial investigation revealed that Duquesne Light paid Lasean her wages via direct deposit into one of her bank accounts. (*Id.* at 92-3). Lasean earned W2 income from Duquesne Light in the following amounts: $23,323 in 2012; $37,678 in 2013; and $57,619 in 2014. (*Id.*). Special Agent Currie found no evidence that Lasean was paid cash by Duquesne Light for her work. (*Id.* at 92).

During 2011-2015, Lasean maintained at least four bank accounts at two different financial institutions, PNC and Allegheny Valley Bank. (Docket No. 2617 at 85). She also owned a three-bedroom home at 2326 Vodeli Street, which was subject to a mortgage held by

---

[1]      Both of the defendants also have children from prior relationships. (*See* Docket No. 2499 at ¶ 80-82). Lance's son, Khyree, was also convicted as part of this case; however, Lasean's son, Ricardo Nunley, was not involved in this criminal activity, based on the record before this Court.

Wells Fargo Bank.  (*Id.* at 98-99, 169).  Lasean fell behind on said payments and in late 2011, she entered into an emergency home loan program for homeowners who could not make their mortgage payments with the Pennsylvania Housing Finance Authority, ("PHFA").[2]  (*Id.* at 98-99; Govt. Ex. G44).  Through this program, the PHFA paid Lasean's arrears of nearly $3,000 to Wells Fargo and made future payments totaling approximately $8,000 which included paying the mortgage on 2326 Vodeli Street throughout 2012.  (*Id.*).  Her mother, Nunley, testified that she was neither aware that Lasean was involved in this program nor that her mortgage was being paid by PHFA.  (*Id.* at 169-70).  Nunley acknowledged, however, that the Gardenhires were in a difficult position financially in 2011-2012.  (*Id.* at 170).

Lance was in pretrial custody during the proceedings at Criminal Number 10-47 and ultimately released in May of 2012.  (Docket No. 2617 at 82).  Lance had no legitimate income while he was incarcerated.  He also did not file a tax return for the 2011 tax year.  (*Id.* at 86).  As is noted in further detail below, there is no credible evidence in the record demonstrating that Lance generated income through legitimate employment during 2012 through 2015.

To the contrary, the evidence presented to the Court establishes that starting in July of 2012, Lance generated significant amounts of cash through heroin trafficking.  In this regard, Wysong explained that he and Lance had been friends since 2006, at which time they sold cocaine together, among other things.  (Docket No. 2617 at 65).  Wysong testified that when Lance was released from custody, he was "completely broke" and had an outstanding debt of $30,000 to his New Jersey-based heroin supplier from past dealings.  (*Id.* at 14-16).  Wysong and Lance agreed to start a "business venture" selling heroin together using Lance's source starting

---

[2]     The terms of the program with PHFA were such that the funds would not have to be repaid if Lasean maintained the property as her primary residence and did not lease it to anyone for a period of five years.  (Docket No. 2617 at 100).  Through his investigation, Special Agent Currie found indicia demonstrating that Lasean had leased the property to a third party and it is uncontested that she and Lance moved to 405 Zara Street less than five years after she entered into this agreement.  (*Id.* at 84; Docket Nos. 2667; 2706).

in July of 2012. (*Id*. at 13). Since Lance had no money, Wysong provided $10,000 to pay off the outstanding debt to the supplier and paid an additional $12,000 to buy the first 100 bricks of heroin which they then sold together. (*Id*. at 13-14). They drove to New Jersey to close this deal around the 2012 Fourth of July holiday. (*Id*. at 14-15). Wysong noted that he and Lance started out making these types of heroin supply trips to New Jersey a few times a month and then others would join in and they would make these trips more often. (*Id*. at 43-44). He explained that their operation started out slow and then picked up toward the end of 2012. (*Id*. at 44). Lance, Wysong and/or others continued to make similar trips several times a month until the conspiracy ended in 2015. (*Id*. at 16-17). For example, he provided details of a supply trip taken in January of 2015 at which time he was present in a hotel room with Lance, Lasean and Cheatom and observed at least a few hundred thousand dollars being counted which was later used to purchase heroin. (*Id*. at 17-24). Naturally, these narcotics trafficking activities generated substantial amounts of cash for the participants, including Lance.

In contrast, there was no credible evidence introduced at the hearing demonstrating that Lance earned income from legitimate employment during the period of 2012-2015. To this end, Special Agent Currie testified that he was unable to find any legal sources of income for Lance during that timeframe. (Docket No. 2617 at 30, 94). At most, Lance's individual tax return filed for tax year 2012 and his joint return filed with Lasean for tax year 2013 denote income Lance allegedly earned for work at Headlinz Male Grooming Lounge and Freelance Entertainment and claimed expenses related to the operation of those entities.[3] (*Id*. at 85-86; Govt. Ex. J39). However, Special Agent Currie was not able to verify this income or that these were legitimate

---

[3]     The tax return for 2012 also appears to provide false information in that Lance claims his son, Khyree as a dependent who lived with him for 12 months which is a factual impossibility given Lance's incarceration until May of 2012. (Docket No. 2617 at 47-48, 82). He also listed 405 Zara Street as the business address on the 2012 return but that property was not purchased until November of 2012, required significant rehabilitation work, and the Gardenhires did not move in until 2014. (Govt. Ex. J39).

businesses.  (Docket No. 2617 at 30, 94).  He told the Court that the tax preparer, Jonnet Solomon, did not produce any receipts or any other documents in support of the claimed income or expenses in response to a subpoena.  (*Id.* at 87-88; 131-33).  Further, the search warrants executed at the Gardenhires' properties did not result in the seizures of any records related to these businesses.  (*Id.*).  Moreover, Lance also did not file a tax return for the 2014 tax year.  (*Id.* at 87).

With respect to the alleged barber business, Special Agent Currie determined that Lance's barber license had expired in 2008, (*Id.* at 94-95); he found no evidence of barber equipment at the residences, (*id.* at 95-96); and his review of the bank records showed only $200 in total charges to a beauty supply store from 2012-2015, (*id.*).  In addition, Wysong and Lance's father, Bey, testified that they did not observe Lance cutting hair for profit and each acknowledged that Lance had cut their own hair for free on occasion.  (*Id.* at 30-31; 201).  Similarly, the alleged concert promotion income could not be verified by Special Agent Currie because the owner of Groove Productions advised that Lance had done only "pro bono" work to promote an event and the financial investigation located one check to Lance for a few thousand dollars, which Special Agent Currie noted was "unremarkable" relative to the amount of cash deposits and cash transactions that were made by the Gardenhires. (*Id.* at 96-97).  Special Agent Currie also investigated other potential sources of income for Lance and found that he was accepted for an apprenticeship program with Local Carpenters Union 213 but was terminated in 2009 due to excessive absences from work.  (*Id.* at 98).  In response, Defendants offered no additional evidence showing that Lance worked legitimately.

      d.  *The Alleged Gifts*

As noted, the Gardenhires were married on July 14, 2012 at Shiloh Baptist Church in Homewood. (Docket No. 2617 at 157). Nunley attended her daughter's wedding as well as the reception which followed at the Morning Glory Inn. (*Id.* at 157-58). She testified that she was also present on the Monday after the wedding at which time the cash gifted to the Gardenhires in cards left in the wedding box was counted. (*Id.* at 158). Nunley claimed that the gifts in the cards included a total of $15,000, i.e., $13,500 in cash and $1,500 in checks. (*Id.* at 159-161). Of this amount, Nunley purportedly personally gifted the couple $2,500 at that time. (*Id.* at 159). Aside from Nunley's testimony, no additional evidence was offered to support the amounts of these gifts and such gifts were not reported on Lasean's tax return for the 2012 tax year. (Govt Ex. J39).

Nunley also testified that she personally provided the Gardenhires $6,500 in cash gifts during 2012, including: $2,500 in July 2012; $2,000 in August 2012; and $2,000 in December 2012. (Docket No. 2617 at 160, 163). She told the Court that she gave these gifts to help "her children" because they were in a difficult position financially as her daughter was working part-time, Lance had recently been released from jail and they had two young children to support. Nunley stated at the hearing that her bank records would support her testimony. (*Id.* at 160-61, 167). However, upon review of such records, the Court finds that the amount of gifts allegedly made by Nunley are not supported by a preponderance of the evidence. *See United States v. Voight*, 89 F.3d 1050, 1082-84 (3d Cir. 1996) (credibility of evidence in forfeiture proceeding determined by a preponderance of the evidence). Among other things, Nunley testified that she had approximately $10,000 in her bank account in July of 2012 which permitted her to make such gifts but the admitted bank records show that she had a negative balance on eight days in July of 2012 and that the account had no more than $4,164.70 during that month. *See Nunley*

*Bank Statement July 2012*.  She also incurred numerous charges and fees for overdrafts and non-sufficient funds during 2012 totaling $3,804.  *See Nunley Bank Statements July-December 2012*. In addition, multiple cash withdrawals over the same time period were made from the ATMs at the Meadows Racetrack and Casino, suggesting that such withdrawals were used to gamble rather than to gift cash to her daughter and son-in-law.  *Id.*

According to Nunley, Lasean told her that she saved all of the cash that they received as wedding presents at her house on Vodeli Street, including $1,500 in checks that she cashed and the additional $2,000 her mother allegedly gifted her in August, for a total of $17,000.  (Docket No. 2617 at 160-62).  Lasean also explained to her mother that she was saving the money to buy a bigger house and did not want to "mix it" with her other money out of fear that she may spend it.  (*Id.* at 161).  The Court does not credit these hearsay statements for several reasons.

First, Nunley did not specify <u>when</u> this conversation (or conversations) with her daughter took place in the five years between the wedding in July 2012 and her testimony on August 21, 2017 or provide any corroborating evidence as to same, undermining the reliability of such hearsay statements.  (*Id.* at 160-62).  Second, it is simply implausible that Lasean kept approximately $17,000 in cash at her home in a place away from her husband for five months between July and November of 2012 given all of the facts and circumstances at that time.  In particular, the Gardenhires were "completely broke," supporting two children, and their only legitimate income was from Lasean's part-time work at Duquesne Light.  (*Id.* at 14-16, 167). Lance, who is clearly the leader of the criminal activity and the Gardenhire household, needed cash because he had reentered the heroin trafficking business two weeks prior to the couple's wedding and had to borrow $10,000 in cash from Wysong to pay off his debt to his supplier and another $12,000 to invest in the initial heroin supply trip over the Fourth of July.  (*Id.* at 13-14).

Third, large amounts of cash were suspiciously laundered through Lasean's bank accounts in October and November 2012, as is described in the next section of this Opinion. *See* § II.e, *infra*. Fourth, the record is replete with evidence of Lasean's dishonest behavior, including, her conviction for conspiracy to commit money laundering, (*see* Docket No. 2263); her conduct in submitting a false gift form when purchasing the Titan truck, (*see* Govt. Ex. G43); her violations of the terms of the PHFA program, (*id.* at 98-99); and, her prior convictions for making false statements to obtain public assistance, (*see* Docket No. 2501 at ¶¶ 25-26). *See also* 18 U.S.C. § 3553(a)(1) ("The court, in determining the particular sentence to be imposed, shall consider--(1) the nature and circumstances of the offense and the history and characteristics of the defendant;" *cf. United States v. Smith*, 2007 WL 1847441, at *5 (3d Cir. Jun. 8, 2007) (evaluating credibility of witness testimony in light of defendant's prior criminal history involving dishonesty and false statements). Overall, the Court holds that the record lacks reliable evidence that the gifted cash was held by Lasean between July and November 2012 and it is more likely than not that Lance used any gifted cash from the wedding or his mother-in-law to invest in one or more of the many heroin supply trips which took place between July and November 2012 or that the Gardenhires used any such gifts to pay for household expenses.

      e. *The Purchase and Renovation of 405 Zara Street*

The Gardenhires entered into a sales agreement with Fannie Mae dated October 9, 2012 to purchase 405 Zara Street for $21,900. (Docket No. 2617 at 103). Grasha Real Estate ("Grasha") served as Fannie Mae's agent. (*Id.* at 103). Lasean provided a check drafted to Grasha for $2,190 which served as hand money along with the executed sales agreement. (*Id.* at 108; Govt. Ex. J40). The sales agreement noted that the property was acquired by Fannie Mae through a foreclosure or similar proceeding and that the property was being sold in "as is"

condition to the Gardenhires. (Govt. Ex. J40). Bey and Nunley each confirmed that the property was in poor shape at the time of purchase and needed a lot of rehabilitation to make it habitable. (Docket No. 2617 at 172, 200). The Gardenhires closed on the house on November 13, 2012, funding the purchase using cashier's checks obtained from financial institutions. (*Id.* at 112-13). With that said, the parties agree that the purchase was effectively a cash transaction because Lasean made numerous cash deposits into her accounts prior to the closing. (Docket Nos. 2667 at 2 ("Cash was deceptively funneled through the bank accounts to make it appear that the Gardenhires had sufficient lawful wealth to purchase 405 Zara Street and to make it seem like the transaction was something other than what it really was – i.e., a de facto cash purchase"); 2706 at ¶ 2 ("They purchased a house at 405 Zara Street ... The price was $21,900; they paid cash.")).

Special Agent Currie's financial investigation revealed that as of October 9, 2012, Lasean lacked sufficient funds in her bank accounts to purchase the property as she had less than $3,000 in her two PNC accounts and less than $3,000 in her two Allegheny Valley Bank ("AVB") accounts. (Docket No. 2617 at 105). She then proceeded to deposit a total of $20,000 in cash into these four separate accounts during a twenty-four-hour period extending from October 9 and 10, 2012 and an additional $11,000 in cash into three separate accounts on the date of the closing, November 13, 2012. (*Id.* at 111). In this regard, Lasean deposited $6,000 into PNC account '0349 at the branch on Banksville Road at 1:28 p.m. on October 9, 2012. (*Id.* at 109). She then drove downtown and deposited $3,000 into PNC account '6493 at the branch on Grant Street at 4:07 p.m. and an additional $3,000 into PNC account '0349 at the same location. (*Id.* at 110-11). At 12:22 p.m. the next day, Lasean deposited $4,000 in cash into Allegheny Valley Bank ("AVB") account '9140 and then an additional $4,000 in cash into account '2841. (*Id.* at

111).  These transactions took place at an AVB branch on Greentree Road in the South Hills. (*Id.* at 111).  Similarly, on November 13, 2012, Lasean deposited $5,000 into PNC account '6493; $2,000 into AVB account '2841; and $4,000 into AVB account '9140.  (*Id.* at 112). Lasean then obtained a total of $22,000 in cashier's checks written against three of the accounts (two AVB and one PNC) which were used to fund the closing.  (*Id.* at 112-13).  On cross-examination, Special Agent Currie admitted that he had no way of knowing if the money that went into the purchase of 405 Zara Street was tainted drug proceeds or not.  (*Id.* at 140-41).  He added that the tax returns are not dispositive of a taxpayer's legitimate income because a taxpayer can declare any amount of income on his or her returns.  (*Id.*).

Special Agent Currie testified that financial institutions such as PNC and AVB are required to prepare currency transaction reports ("CTR") for any transaction that exceeds $10,000.  (Docket No. 2617 at 111).  He explained that some financial institutions prepare CTRs if the total amount of a number of smaller transactions exceed the $10,000 amount and that Lasean's deposits into the separate PNC accounts on October 9, 2012 triggered its preparation of a CTR for those transactions.  (*Id.* at 111-12).  Based on the amounts of the deposits into the various accounts, all of which were less than $10,000, over such short periods of time, it appears that the deposits were structured in a way to attempt to avoid the financial institution's requirement of filing a CTR.  No other explanation has been provided by the defense.  (*See* Docket No. 2706).

After the closing, the Gardenhires commenced renovations at the Zara Street house but continued to live at their home on Vodeli Street.  (Docket No. 2617 at 172, 199-201).  A receipt obtained during the investigation showed that Lance paid Michael Booth $2,000 for debris removal and framing which was completed on November 19 or 20, 2012.  (*Id.* at 104).  Bey and

Timbers testified as to the extensive renovations which were completed at the property.  (*Id.* at 183-214).  On the outside, they cut down trees, excavated, rebuilt the front porch, added a fire escape, installed soffit and fascia; worked on the roof and put up a fence.  (*Id.* at 186-88, 196, 200-01, 203, 211, 214, 219). On the inside, they installed new floors, and drywall, updated the kitchen and bathrooms, replaced the windows and doors, and painted, among other things.  (*Id.* at 186-89, 194, 197, 203-04, 210-11, 214). Bey and Timbers explained that a group of individuals, including Lance, his son Khyree, Lasean's son Ricardo Nunley, and other relatives did the majority of the work on the home.  (*Id.* at 186, 196-98, 201-02, 206). The defense introduced pictures showing several of these individuals engaging in construction activities.  (Def. Exs. 1-2). Wysong observed the renovations at 405 Zara Street as well and added that Lance had hired a contractor at his recommendation who built a deck on the property but Lance "stiffed" the contractor and did not pay for all of the work which he performed.  (Docket No. 2617 at 36-39, 67-68).

Both Bey and Timbers confirmed that none of these individuals were paid for their work and they told the Court that they were involved simply for the purpose of helping out Lance and Lasean, who were their relatives or friends.  (Docket No. 2617 at 197-98, 202-06, 210, 213, 219). Despite the lack of payment, these witnesses provided estimates as to the number of hours they allegedly worked and the hourly rates for each of the workers.  In this vein, the defense estimates the following.  Bey[4] performed services valued at $41,760, computed as $15 per hour for 24 hours per week, for 52 weeks in 2013; 48 weeks in 2014; and 16 weeks in 2015.  (*Id.* at 194-96). Lance provided services similar to his father valued in the same amount.  (*Id.* at 195).  Timbers completed 30 hours a week during 2013-2014, at $15 per hour, for a total of $23,400.  (*Id.* at

---

[4]     Bey admitted that he has suffered from a heroin addiction for many years and that he was in a rehabilitation facility for 30 days during 2014.  (Docket No. 2617 at 191-92).

210-12).  Finally, Khyree and Ricardo performed less skilled labor at $10 per hour and 20 hours per week, for 17 weeks, totaling $3,400 each.  (*Id.* at 196-97).

The record is unclear on the precise date that the Gardenhires moved into 405 Zara Street but it was at some point during 2014 prior to the commencement of the wiretap portion of the instant investigation in August or September, 2014.  (Docket No. 2617 at 135-36, 144, 172, 193, 207).  Bey lived with them for a time, as did the couple's younger children.  (*Id.* at 207).  Despite same, Wysong testified convincingly that he picked up heroin from Lance at 405 Zara Street on several occasions and dropped off cash with Lasean at the home many times to pay Lance for heroin that he was provided on credit.  (*Id.* at 40-43). This information was corroborated by intercepted wiretap communications wherein Wysong discussed with a codefendant dropping off cash with "Sean" and the description of the narcotics activities taking place at 405 Zara Street was otherwise consistent with the information proffered to the Court throughout these proceedings.  (Govt. Ex. 2).  According to the Gardenhires' PIRs, the fair market value of 405 Zara Street is $122,000.00; no other valuation was provided.  (Docket Nos. 2499 at ¶ 97; 2501 at ¶ 56).

f.  *The Gardenhires' Cash Deposits and Purchases During 2013-2015*

As is reflected in the Government's demonstrative exhibits, Special Agent Currie's investigation of the Gardenhires' finances revealed that they had $194,425 in cash deposits ($100,149) and cash purchases ($94,276) during 2013-2014 but minimal cash withdrawals and net cash income, (approximately $5,700), over the same time period.  (Govt. Ex. Demo 1; 2617 at 117-18).  The demonstrative exhibits did not cover 2015 because their activities ended upon Lance's arrest in May of that year, but Special Agent Currie testified that, among other things, the Gardenhires purchased $15,000 worth of jewelry from Brilliant Nuevo Diamonds during

2015 and detailed $8,690 in cash deposits they made in March and May of 2015. (*Id.* at 120-21; 127-28; J38; J41). Since no other credible explanation was provided, the Court finds that all of the money designated as cash deposits and cash purchases constitutes drug proceeds.

The couple's cash purchases of $94,276 in 2013-2014 were spent on materials for home improvements, ($64,956) and vehicles, ($32,171). (Govt. Ex. Demo 2). To support the cash purchases, the Government introduced records from the stores where the materials were bought. *See e.g.*, J45 (Brookside Lumber Purchase Records), J46 (Lumber Liquidators Purchase Records), J47 (Tile Shop Purchase Records), J48 (Plumbers Equipment Purchase Records). Bey and Timbers admitted that they were not involved in the purchasing of materials. With respect to the vehicles, the Gardenhires purchased: a Mercedes GL450 using $23,320 in cash, (Govt. Ex. J49); a Mercedes S550 sedan for $38,714, which was financed, (Govt. Ex. J50, J51); and a Nissan Titan truck which was paid for in $10,000 cash, (Docket No. 2617 at 32-33; Govt. Ex. 43). Wysong testified that Lance told him that he purchased the Mercedes with cash which raised concerns for him that law enforcement would investigate their activities. (Docket No. 2617 at 33). Special Agent Currie explained that car dealerships file FinCen reports similar to CTRs and that Bobby Rahal Automotive filled out such a form when Lance bought the Mercedes with cash. (*Id.* at 122; Govt. Ex. J49). Wysong also examined a gift form for the transfer of the Nissan Titan Truck that he and Lasean signed and admitted that it was totally false because he was paid $10,000 for the truck and he and Lasean are not brother and sister as is noted on the form. (*Id.* at 32-33; Govt. Ex. 43). Finally, Special Agent Currie's review of Lasean's bank accounts likewise shows that the Gardenhires made $120,611 in non-cash account debits during 2012-2015. (Govt. Ex. Demo 3). Among other things, their purchases included: $15,049 in cell

phones; $14,664 in car rentals; $17,608 in travel; $27,280 in retail; and $46,010 in private school tuition for their children. (*Id.*).

## III. LEGAL STANDARDS

Federal Rule of Criminal Procedure 32.2 provides that "[a]s soon as practical after a verdict or finding of guilty ... on any count in an indictment ... regarding which criminal forfeiture is sought, the court must determine what property is subject to forfeiture under the applicable statute. If the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense." FED. R. CRIM. P. 32.2(b)(1)(A).[5] "The court's determination may be based on evidence already in the record, including any written plea agreement, and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." FED. R. CRIM. P. 32.2. It is the Government's burden to demonstrate that the property is subject to forfeiture under the asserted statutes by a preponderance of the evidence. *See United States v. Voight*, 89 F.3d 1050, 1082-84 (3d Cir. 1996).

The Court is tasked with weighing the credibility of the evidence presented by the parties. *See e.g., United States v. Crews*, 885 F. Supp. 2d 791, 801 (E.D. Pa. Aug. 14, 2012) (evaluating credibility of witnesses presented in forfeiture dispute); *United States v. Perez*, 386 F. App'x 301, 304 (3d Cir. 2010) (citations omitted) (court evaluates credibility of evidence presented at sentencing). As such, the Court can accept some parts of the evidence and reject other portions of the evidence. *United States v. Shumaker*, 2011 WL 13176084, at *16 (W.D. Pa. Mar. 28, 2011),

---

[5] The forfeiture statute was amended in 2009 to permit a court to enter a forfeiture order at sentencing stating that it may later be amended. *See* FED. R. CRIM. P. 32.2(b)(2)(C). The parties here consented to the Court deferring its ruling on forfeiture until after the sentencing proceedings were concluded and the criminal judgments reflect same. (*See* Docket Nos. 2609 at 7; 2634 at 7 ("pursuant to Rule 32.2(b)(2)(C), this Forfeiture Order may be amended to include the forfeiture of additional property, that is, defendant's interest in 405 Zara Street, which is the subject of pending forfeiture litigation before this Court.")).

*aff'd,* 475 F. App'x 817 (3d Cir. 2012) (citation omitted)). The Court may also "assess credibility in light of the maxim, falsus in uno, falsus in omnibus ... defined as 'false in one thing, false in everything.'" *Bennun v. Rutgers State University*, 941 F.2d 154, 179 (3d Cir. 1991) (quoting BLACK'S LAW DICTIONARY 543 (5th ed. 1979)); *see also* 3d Cir. Model Crim. Jury Instr. § 4.26 ("If you believe that a witness knowingly testified falsely concerning any important matter, you may distrust the witness' testimony concerning other matters. You may reject all of the testimony or you may accept such parts of the testimony that you believe are true and give it such weight as you think it deserves.").

## IV. DISCUSSION

The Government seeks forfeiture of Lance and Lasean's interests in 405 Zara Street primarily pursuant to 18 U.S.C. § 982(a)(1) based on their convictions of conspiracy to commit money laundering. (Docket Nos. 2568; 2578; 2667). It also alternatively argues that the residence is forfeitable as a substitute asset pursuant to 18 U.S.C. § 982(b)(1) and 21 U.S.C. § 853(p). (*Id*.). The Government further maintains that Lance's interests in 405 Zara Street should be forfeited under 21 U.S.C. § 853(a)(1) based on his conviction for conspiracy to distribute heroin. (*Id.*). Defendants contest the forfeiture of the entire residence, arguing that the property should be subject to only partial forfeiture. (Docket Nos. 2569; 2584; 2706). Specifically, Defendants argue that "only that portion of the property that was funded by tainted funds and/or improved with tainted funds is subject to forfeiture," and that any forfeiture of Lance's interest in the property due to his drug conviction would not affect Lasean's interest in the property. (Docket No. 2584). They suggest that the property should be sold and that the proceeds from the sale should be apportioned among the Government and the Defendants based on the value of the tainted and untainted portions of same. (Docket No. 2706). After careful consideration of the

parties' positions and weighing the credible evidence of record, the Court finds that the entirety of Lance and Lasean's interests in 405 Zara Street is subject to forfeiture to the Government.

### A. Forfeiture of Defendants' Interests in 405 Zara for Money Laundering Convictions

Section 982(a)(1) provides, in relevant part, that "[t]he court, in imposing sentence on a person convicted of an offense in violation of section 1956, 1957, or 1960 of this title, shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property." 18 U.S.C.A. § 982(a)(1). "Property 'involved in' the offense 'includes the money or other property being laundered (the corpus), any commissions or fees paid to the launderer, and any property used to facilitate the offense.' Further, property 'traceable to' means property where the acquisition is attributable to the money laundering scheme rather than from money obtained from untainted sources." *United States v. Gordon*, 710 F.3d 1124, 1135 n.13 (10th Cir. 2013) (citation and punctuation omitted). As the Court of Appeals explained in *Voigt*,

> the government must prove by a preponderance of the evidence that the property it seeks under § 982(a)(1) in satisfaction of the amount of criminal forfeiture to which it is entitled has some nexus to the property "involved in" the money laundering offense. For example, if the defendant receives $500,000 cash in a money laundering transaction and hides the cash in his house, the government may seize that money as property "involved in" the money laundering offense. If the defendant purchased a $250,000 item with that money, the government may seek the remaining cash as "involved in" the offense, whereas the item purchased is subject to forfeiture as property "traceable to" property involved in the money laundering offense.

*Voigt*, 89 F.3d at 1087. "[O]nce a defendant has commingled laundered funds with untainted funds—whether in a bank account or in a tattered suitcase—such that they 'cannot be divided without difficulty,' 21 U.S.C. § 853(p)(5),' the government must satisfy its forfeiture judgment through the substitute asset provision. Once property subject to forfeiture under § 982(a)(1) is no

longer identifiable due to some act of the defendant, the government may seek any property, cash or merchandise, in satisfaction of the amount of criminal forfeiture to which it is entitled." *Id.* at 1088. In a later decision, *United States v. Stewart*, 185 F.3d 112, 129-30 (3d Cir. 1999), the Court of Appeals clarified that *Voight* is inapplicable in a situation where the laundered money can be traced to the account where the commingled funds are located or if the tainted funds can be separated from the untainted funds.

In this Court's estimation, the Government demonstrated by a preponderance of the evidence that 405 Zara Street is subject to forfeiture pursuant to 18 U.S.C. § 982(a)(1). At the outset, the Court resolves the credibility dispute between the parties concerning the alleged untainted wedding gifts in favor of the Government. As is fully described in the Court's findings above, the Court neither credits Nunley's testimony regarding the amounts of the alleged wedding gifts because such amounts were not corroborated by any other evidence of record nor does it accept the unreliable hearsay statements attributed to Lasean – an incredible source – that she purportedly kept nearly $17,000 in cash away from her husband for a five-month period between July and November of 2012. *See* § II.d., *supra*. To reiterate, Nunley testified that her bank records would support the alleged gifts that she made to the Gardenhires but the account activity from her bank statements show that she was not in a strong enough financial position to have made such gifts. (Docket No. 2617 at 160-61, 167; *Nunley Bank Statement July 2012*). In addition, beyond Nunley's unsupported testimony, no evidence was presented to corroborate the amount of gifts allegedly made by the third party wedding guests. The Court also rejects the hearsay statements attributed to Lasean about saving the gifted cash for five months because: she is not a credible source based on her criminal conduct and other acts of dishonesty; this theory is simply implausible given the totality of the circumstances; and, $31,000 in cash was suspiciously

laundered through her bank accounts in October and November of 2012 in a manner to avoid the filing of CTRs and which was wholly unnecessary if the purchase of 405 Zara Street was with legitimate funds. *See* § II.d, *supra*. As the Court notes above, the credible evidence of record shows that it was more likely than not that any cash gifts obtained by the Gardenhires from their wedding or otherwise were later used by Lance and invested into his fledgling heroin "business venture" or simply used it to pay household expenses such that the cash gifts were not saved for five months and then used to purchase the house, as they have suggested.

Defendants make much of the asserted admission by Special Agent Currie that he could not delineate between the tainted and untainted funds in the Gardenhires' accounts which were used to purchase the house. (*See* Docket No. 2706 (citing Docket No. 2617 at 140-41)). But, this position no longer holds any weight because Special Agent Currie's testimony was in response to questioning premised upon the assumption that certain of the Gardenhires' funds were gifted and the Court has rejected the Gardenhires' position on the gifts given its lack of credibility.

The Court next agrees with the Government that the defense has essentially abandoned any claim that Lance generated legitimate income through barbering, concert promotion activities or otherwise between 2012 and 2015. (*See* Docket Nos. 2667; 2706). With that said, the detailed factual record developed by the Government disproves any alleged legitimacy of those activities, including the income claimed on the Gardenhires' tax returns filed in 2012 and 2013, which the preponderance shows contain a litany of false claims concerning Lance's alleged work which has not been substantiated. (Docket No. 2617 at 30, 85-88, 94-96, 131-33; Govt. Ex. J39). Lance did not file a return for 2014 and there is no evidence at all of any such alleged business operations during 2014 or 2015. (Docket No. 2617 at 87). Overall, Defendants

failed to offer any credible evidence to show that Lance generated cash through legitimate means. In light of these findings, the record plainly establishes that all of the Gardenhires' cash deposits and cash purchases between 2012 and 2015 were made with drug proceeds and were not from untainted sources.

Having resolved these factual disputes, the Court's evaluation of the forfeiture issue is rather straightforward. The parties agree that the purchase of 405 Zara Street was effectively a cash transaction and since the cash was all generated through heroin trafficking, the Court holds that the house was procured with drug proceeds laundered through Lasean's bank accounts. To this end, the Gardenhires did not have sufficient money in Lasean's bank accounts to purchase 405 Zara Street for $21,900 prior to the day that the sales agreement was signed, i.e., October 9, 2012. (Docket No. 2617 at 105). Indeed, Lasean only earned a total of $23,323 from her part-time work at Duquesne Light during all of 2012, which was the only legitimate income earned by the Gardenhires. (*Id.* at 92-3). To fund the transaction, they laundered $20,000 in drug proceeds by depositing varying amounts into four of Lasean's accounts at PNC and AVB on October 9 and 10, 2012. (*Id.* at 110-13). A check in the amount of $2,190 was then written out to Grasha which represented hand money on the purchase. (*Id.* at 108). On the date of the closing, November 13, 2012, the Gardenhires laundered another $11,000 in drug proceeds by depositing varying amounts into three different bank accounts held by Lasean at PNC and AVB. (*Id.* at 112-13). The house was then paid for with $22,000 in cashier's checks drawn against those accounts. (*Id.*). Because the drug proceeds laundered through Lasean's accounts were used to purchase the house, it constitutes "real property" subject to forfeiture since it is directly "traceable to" the laundered drug proceeds. *See, e.g., Stewart*, 185 F.3d at 129-30 (tainted funds traced into account were forfeitable as "involved in" and "traceable to" money laundering);

*United States v. Bornfield*, 145 F.3d 1123, 1134 (10th Cir. 1998) ("property 'traceable to' means property where the acquisition is attributable to the money laundering scheme rather than from money obtained from untainted sources" and "proof that the proceeds of the money laundering transaction enabled the defendant to acquire the property is sufficient to warrant forfeiture as property 'traceable to' the offense"); *Voigt*, 89 F.3d at 1084-87.

The Government also cites persuasive caselaw for the proposition that the value of any improvements and increased equity in 405 Zara Street is forfeitable to the Government because the property was purchased with tainted drug proceeds and any legitimately obtained funds used to improve the property furthered the money laundering conspiracy. *See e.g., United States v. Huber*, 404 F.3d 1047, 1058 (8th Cir. 2005); *United States v. Hawkey*, 148 F.3d 920, 928 (8th Cir. 1998) ("the district court correctly ordered that the motor home be forfeited without regard to any increased value that Hawkey may have added. Irrespective of whether the increased value to the converted property is the result of wise investment, personal effort by Hawkey, or by adding Hawkey's personal untainted funds, because the converted property is traceable to the unlawful monetary transaction, we conclude that the property is subject to forfeiture under the statute."); *United States v. Vogel*, 2010 WL 547344, at *4 (E.D. Tex. 2010) (unpublished); *United States v. Kivanc*, 714 F.3d 782, 794 (4th Cir. 2013). Following this precedent, it is not relevant that the Gardenhires and their friends and relatives spent significant amounts of time renovating the house. In any event, the record shows that in 2013-2014 at least $64,956 in materials were purchased by the Gardenhires using cash generated from Lance's heroin trafficking. (Govt. Ex. Demo 2.) It is likewise undisputed that the Gardenhires did not actually pay Bey, Khyree, Ricardo, Timbers or any of the others, (including the deck contractor who Lance "stiffed"), for their work renovating the house. (Docket No. 2617 at 197-98, 202-06, 210,

213, 219). Rather, the defense has simply provided unsupported estimates of what their services were allegedly worth. (*See* Docket No. 2706). Whatever value these services – including installation of thousands of dollars' worth of materials purchased with drug proceeds – added to the house that increased its value was procured by the Gardenhires for free. Since nothing was paid for these volunteer services, it is this Court's opinion that its finding that the property was purchased and improved with tainted drug proceeds as opposed to untainted and legitimately obtained funds stands. *Cf. Huber*, 404 F.3d at 1058 ("even if the expenses were legitimately incurred *by Huber*, they would not reduce the amount subject to forfeiture.") (emphasis in original). Defendants have not cited any binding or persuasive authority to the contrary. (*See* Docket No. 2706).

The Court would alternatively hold that 405 Zara Street is subject to forfeiture as it was "involved in" the money laundering offense. 18 U.S.C. § 928(a)(1). As noted, both the real property and the materials installed into the house were purchased with drug proceeds. The record further reflects that the residence was the situs of drug trafficking activities for at least the period starting when the Gardenhires moved in during the summer of 2014 and ending with Lance's arrest on May 21, 2015. In this regard, coconspirators picked up heroin from Lance at the house and also dropped off money for him there, including, on occasion, leaving drug proceeds with Lasean to provide to Lance at a later time. (Docket No. 2617 at 40-43; Govt. Ex. 2). Given these activities, the drug proceeds were held at the house and then laundered by depositing same into Lasean's accounts, as is discussed above. Accordingly, the evidence supports a finding that the house is subject to forfeiture as it was also "involved in" the offense. 18 U.S.C. § 928(a)(1).

Finally, if the improvements and equity were deemed not subject to forfeiture directly under § 928(a)(1), because the drug proceeds used for the improvements were not laundered directly through Lasean's bank accounts, or otherwise, the Court would hold that the entire property is subject to forfeiture as a substitute asset under § 928(b)(1) and 21 U.S.C. § 853(p). In this regard, it is undisputed that 405 Zara Street is valued at $122,000. (Docket Nos. 2499 at ¶ 97; 2501 at ¶ 56). The Government presented evidence demonstrating that at least $139,839 in drug proceeds was laundered through Lasean's bank accounts between 2012 and 2015, an amount which exceeds the value of the house.[6] (Govt. Exs. Demo 1, Demo 2; Docket No. 2617 at 109-113, 120-21, 127-28). The Gardenhires also made cash purchases using drug proceeds in the amount of at least $109,276 between 2013 and 2015, of which $64,956 was spent on materials for the improvements made at the property.[7] (Govt. Exs. Demo 1, Demo 2). The Government proved that the total amount of cash deposits and purchases made by the Gardenhires over the entire timeframe of the conspiracy of 2012 through 2015 was $249,115. (*Id.*; Docket No. 2617 at 109-113, 120-21, 127-28). The Court has found that the property was purchased (including closing costs) with $24,190.00 in drug proceeds and it was improved with $64,956 in materials purchased with drug proceeds. Based on the valuation of $122,000, there may be equity in the property derived from the volunteer work, meaning that the tainted portion of the property is "commingled with other property which cannot be divided without difficulty." 21 U.S.C. § 853(p)(1)(E).[8] As the property is valued at $122,000.00, the entirety of 405 Zara

---

[6]     Specifically, the Government proved the following: in 2012, $31,000 in cash was deposited on October 9, 10 and November 12 (Docket No. 2617 at 109-113); in 2013-2014, $100,149 in cash deposits were made, (Govt. Exs. Demo 1, Demo 2); and, in 2015, at least $8,690.00 was deposited into the accounts, (Docket No. 2617 at 120-21, 127-28).

[7]     In this regard, the Government demonstrated that the couple made cash purchases of $94,276 during 2013 and 2014 in home improvements and vehicles as well as $15,000 in cash purchases from Brilliant Nuevo Diamonds in 2015. (Govt. Ex. Demo 2; Docket No. 2617 at 120-21, 127-28).

[8]     The Court notes that Defendants suggest that the Government needs to establish all five of these elements prior to forfeiting the property as a substitute asset under § 853(p). (*See* Docket No. 2706). However, the statute is

Street is subject to forfeiture because the Government is entitled to a judgment of at least $139,839 which was the amount of drug proceeds laundered through Lasean's accounts. Hence, the remaining equity in the property will satisfy a portion of that forfeiture judgment.

This type of substitute forfeiture order is particularly appropriate in this case because a large portion of the cash deposited into Lasean's accounts between 2012 and 2015 was spent on other of the Gardenhires' expenses, and are included within $120,611 denoted as "non-cash account debits," such as: $15,049 on cell phones; $14,664 on car rentals; $17,608 on travel; $27,280 on retail; and $46,010 on private school tuition for their children. (*See* Govt. Ex. Demo 3). None of these laundered drug proceeds which the Gardenhires spent on services is now recoverable by the Government; thus, a substitute asset, the house, is needed. The Government likewise established that the Gardenhires made significant cash purchases with drug proceeds ($109,276 between 2013 and 2015) that were not laundered through Lasean's accounts and some of that property has been subject to forfeiture, including two vehicles, i.e., the Mercedes GL450 and the Nissan Titan Truck.[9] All told, the Court concludes that 405 Zara Street is alternatively subject to forfeiture pursuant to 18 U.S.C. § 928(b)(1) and 21 U.S.C. §853(p) as a substitute asset.

For all of these reasons, the Court finds that Lance and Lasean's rights, title and interests in 405 Zara Street are subject to forfeiture to the Government directly pursuant to 18 U.S.C. § 928(a)(1), or, alternatively, as a substitute asset under 18 U.S.C. § 928(b)(1) and 21 U.S.C. §853(p).

---

plainly written in the disjunctive, listing five alternative elements, meaning that the Government can satisfy its burden through proof of any of the five alternative elements. *See* 21 U.S.C. §853(p)(1)(A)-(E). It has done so here.

[9] As to the other vehicles which were forfeited, the Court lacks information about the purchase of the 2008 Infinity; another Mercedes was financed by the Gardenhires; and Lasean has not forfeited her interest in the third Mercedes. In addition, it appears the Government has not sought forfeiture of the $15,000 in jewelry which was purchased in cash with drug proceeds.

*B.  Forfeiture of Lance's Interest in 405 Zara for Drug Trafficking Conviction*

Finally, the Government also moves to forfeit Lance's interest in the house pursuant to 21 U.S.C. § 853(a) based on his conviction for conspiracy to distribute one kilogram or more of heroin, in violation of § 846.  (Docket No. 2667).  Lance has not specifically contested this assertion.  (Docket No. 2706).  Having considered the matter, the Court agrees that forfeiture of Lance's interest is also appropriate on this basis.

"Criminal forfeiture statutes empower the Government to confiscate property derived from or used to facilitate criminal activity."  *Honeycutt v. United States,* 137 S. Ct. 1626, 1631, 198 L. Ed. 2d 73 (2017).  Section 853(a)(1) states that a defendant convicted of violating 21 U.S.C. § 846 shall forfeit "(1) any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation; [and] (2) any of the person's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation."  21 U.S.C. § 853(a)(1).  Property subject to forfeiture includes "real property."  § 853(b)(1).  Further,

> [t]here is a rebuttable presumption at trial that any property of a person convicted of a felony under [§ 846] of this chapter is subject to forfeiture under this section if the United States establishes by a preponderance of the evidence that--
> > (1) such property was acquired by such person during the period of the violation of this subchapter or subchapter II of this chapter or within a reasonable time after such period; and
> > (2) there was no likely source for such property other than the violation of this subchapter or subchapter II of this chapter.

21 U.S.C. § 853(a)(1).  Here, 405 Zara Street was both acquired by the Gardenhires and renovated during the timeframe of the heroin conspiracy for which Lance was convicted, i.e., 2012 through 2015.  Further, as discussed above, the evidence of record establishes that the

house was purchased and renovated using drug proceeds.  Lance also used the property to store heroin and heroin proceeds and some of his heroin trafficking activities took place there.  Hence, the rebuttable presumption applies and, consistent with the Court's above rulings, Lance has failed to prove that the property was purchased and renovated using legitimate funds, making his right, title and interest in the property also subject to forfeiture under § 853(a)(1) due to his drug trafficking.

V.  CONCLUSION

Based on the foregoing, the Court concludes that the Government has established by a preponderance of the credible evidence that Lance and Lasean Gardenhire's respective rights, title and interests in 405 Zara Street shall be forfeited to the United States.  An appropriate Order follows.


*s/Nora Barry Fischer*
Nora Barry Fischer
U.S. District Judge

Dated: December 13, 2017

cc/ecf: All counsel of record.

Lance Gardenhire c/o James Wymard, Esq.

Lasean Gardenhire c/o Charles Schwartz, Esq.